IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff/Respondent* v. JAMES MICHAEL STEWART, *Defendant/Petitioner*. | Case No. 20-CR-000126-RAW |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

The United States of America hereby responds to Defendant's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 and respectfully requests the motion be denied and dismissed, without an evidentiary hearing.

### FACTUAL AND PROCEDURAL BACKGROUND

**Procedural Background**

On November 17, 2020, a Superseding Indictment charged Defendant with Count One: Aggravated Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 1151, 1153, 2241(a) & 2246(2)(B); Count Two, Aggravated Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 1151, 1153, 2241(a) & 2246(2)(A); Count Three, Attempted Aggravated Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 1151, 1153, 2241(a) & 2246(2)(A). (*Superseding Indictment*). A jury later returned a verdict finding the Defendant not guilty on Counts 1 and 2, but guilty on Count 3. (*Verdict*). On June 07, 2022, Defendant was sentenced to 72 months of imprisonment on Count Three, five years of supervised release, and a $100.00 assessment each for Counts Two and Three. (*Judgment*, Doc. #189, at 2).

Defendant appealed raising the following three issues: whether the District Court errored

1

in denying the Defendants motion for acquittal; whether it was prejudicial error to exclude defense expert witness testimony regarding intoxication; and whether it was prejudicial error to deny Defendant's motion for separate trials. The Tenth Circuit affirmed. *United States v. Stewart*, 2023 WL 6629579 (10th Cir. Oct. 12, 2023).

Defendant filed this § 2255 motion on December 31, 2024. (*Motion*, Doc. #214).

**Factual Background**

 *A.* *Factual Summary of the June 8-10, 2021 Jury Trial*

  1. *Defendant's Attempted Aggravated Sexual Abuse of Heather Drywater*

On May 25, 2018, Heather Drywater finished her shift at Little Caesars and went to a friend's house on the west side of Muskogee. (TT 31).[1] While at this house, Defendant texted Drywater to see if she wanted to hang out with him that evening. (TT 31). Drywater and Defendant had met two or three years previously while shooting pool at a bar. (TT 29). They never had a romantic relationship but had met up socially approximately ten prior times. (TT 29-30). Normally, they would bar hop, shoot pool, or drink alcohol when spending time together. (TT 30). Drywater referred to Defendant as a "drinking buddy." (TT 30).

Drywater agreed to see Defendant and he picked her up from her friend's house. (TT 31). They tried to go to multiple bars, but because it was late many of the bars were closed. (TT 31-32). They did visit the VFW, the All In Tavern, Coco Bongos, and possibly York Town. (TT 32). After the bars closed, Drywater and Defendant went to the Studio 6 hotel to continue drinking. (TT 33).

It was common for Drywater and Defendant to share a hotel room after a night of drinking. (TT 33-34). Drywater did not have a stable residence at the time, and she and Defendant had

---

[1] "TT" refers to the trial transcript. These facts are also summarized in the Tenth Circuit opinion at *1-2.

2

shared a hotel room about every time they had gone out drinking in the past. (TT 33-34). Drywater never had a prior sexual relationship with Defendant and was not interested in any type of sexual relationship with him. (TT 34-35). During their hotel stays, they shared a bed with Defendant opting to sleep naked. (TT 35). Drywater, however, slept fully clothed "so that [Defendant] wouldn't get any ideas." (TT 35).

When they arrived at the hotel, Drywater and Defendant continued to drink Bud Light beer. (TT 36). They drank almost a twelve pack of beer and then Defendant removed his clothes. (TT 36-37). Drywater told Defendant that she was going to shower, and she went into the bathroom and ran the shower. (TT 37). However, Drywater did not shower, but she stayed in the bathroom fully clothed. (TT 37). Drywater locked the bathroom door and hoped Defendant believed she was showering. (TT 37).

Eventually, Drywater returned to the room, still fully clothed. (TT 37-38). As Drywater stood at the foot of the bed, Defendant approached her, still naked, and pressed his body against Drywater. (TT 38). Defendant used his body to push Drywater onto the bed until Drywater's back was completely on the bed. (TT 38). As Defendant laid on top of her, Drywater had difficulty breathing because of how much weight Defendant was pressing on her. (TT 39). Defendant was positioned so that his chest and stomach were directly on top of Drywater's chest and stomach. (TT 39). Drywater tried unsuccessfully to push Defendant off her. (TT 40). As Defendant laid on her, Drywater was able to push him off enough so that she could slide out from underneath his body. (TT 40-41). Defendant did not raise up voluntarily, but only because Drywater pushed him off. (TT 54). After escaping from under Defendant, Drywater immediately went to the bathroom and locked the door. (TT 41). From inside the locked bathroom, Drywater called 911. (TT 41).

3

Standing in the bathroom, Drywater was worried about her safety, contemplated how to get out of the hotel room, and feared Defendant would break down the bathroom door. (TT 41). As she waited for police, Defendant tried to get into the bathroom. (TT 42). He jiggled the door handle and knocked on the door. (TT 42). When Drywater refused to open the door, Defendant started banging and pounding on the door.[2] (TT 42). Unable to access the bathroom, Defendant became angrier and stomped around the hotel room. (TT 46).

At the beginning of the 911 call, Drywater was quiet and hesitant to speak because she did not want Defendant to know she was on the phone. (TT 45; Exhibit 4). Drywater told the 911 dispatcher Defendant was trying to sexually assault her and was overpowering her. (TT 42, Exhibit 4 at 6:40-6:55). She told the dispatcher she did not know if she could trust him because Defendant was drunk. (Id.). Crying and upset, Drywater stated Defendant was mad "because I won't fuck him tonight." (TT 42, Exhibit 4 at 7:00-7:15). Drywater also stated that, "he's strong and horny, and, uh, he's supposed to be my friend." (TT 42, Exhibit 4 at 11:25-11:43).

During the 911 call, Drywater recalled what led to her locking herself in the bathroom:

> And uh but yeah he's, he's, he is way beyond drunk and, uh, he's already like tossed me on the bed . . . because it seemed like overpowering me a little bit. Yeah. It became a joke, and then all of a sudden he's doing this.
>
> . . .
>
> Yeah just because he's liked me for years you know. I've known him for maybe four or five years, and he thinks that just because you know . . . that he's entitled to take advantage of me, and that's not going to happen. But he he's drunk and then he overpowered me for a split second, and I mean that's why I'm scared.

---

[2] Defendant can be heard on the 911 call trying to get into the bathroom. (TT 45).

(TT 42, Exhibit 4 at 12:50-13:27). At trial, Drywater explained that by using the term "split second", she did not mean a literal split second, but rather that Defendant was on top of her for "five breaths" before she was able to escape. (TT 46).

After Drywater called 911, Officer Justin Wardour and Lieutenant Christopher Dean of the Muskogee Police Department responded to the Studio 6 Hotel. (TT 16-19, 24, 60). When they arrived at Room 217, officers found Defendant inside the room, completely naked, and Drywater barricaded inside the bathroom. (TT 20, 61-62).

Lieutenant Dean stayed near the bathroom, while Officer Wardour spoke with Defendant. (TT 20-21). Defendant appeared to be intoxicated and was surprised police were present in the room. (TT 20). After a few seconds, Defendant began to dress while Lieutenant Dean retrieved Drywater from the bathroom. (TT 20-22, 62). When Lieutenant Dean knocked on the bathroom door, he heard Drywater crying inside. (TT 62). When Drywater left the bathroom she was "very noticeably fearful." (TT 63). Drywater cried for the majority of the time she was with Lieutenant Dean. (TT 64).

Once in the hallway, Drywater spoke with Lieutenant Dean. (TT 46-47; Exhibit 5). Drywater stated Defendant was "really aggressive" and "really forceful". (Exhibit 5 at 2:26-2:37). Defendant pushed her down at the edge of the bed, pinned her down, and forced her legs open. (Exhibit 5 at 4:29-4:50). Drywater tried to push him off, but she was unable to "defeat" him until she was able to slip out from under him and escape to the bathroom. (Exhibit 5 at 4:29-4:55). Drywater told Lieutenant Dean she thought she "was about to get raped." (Exhibit 5 at 2:10-2:29).

Officers then removed Defendant from the hotel room and Lieutenant Dean spoke further with Drywater inside the room. (TT 68; Exhibit 6). Drywater again recounted at some point during the evening, Defendant undressed. (Exhibit 6, 3:23-3:36). After Drywater came out of the

5

bathroom, Defendant pushed her on the foot of the bed "out of frustration." (Exhibit 6, 3:36-3:53). Defendant told Drywater, "you know I've always wanted you." (Exhibit 6, 4:00-4:12). While he had her pinned on the bed, Defendant began dry humping Drywater and told her in her ear, "I want to fuck you." (Exhibit 6, 4:44-5:01, 14:58-15:05).[3]

During this interview, Drywater described Defendant as "pummel[ing]" her and "fucking scared the shit out of me." (Exhibit 6, 4:30-4:40). Drywater again stated Defendant "overpowered" her. (Exhibit 6, 5:20-5:44). Drywater said she's known Defendant for years and she never thought Defendant would be so demanding sexually that he would do what he did to her that night. (Exhibit 6, 9:34-9:43). Drywater told Lieutenant Dean she trusted Defendant and did not want to see him get into trouble, but he overwhelmed and overpowered her and "scared the shit" out of her. (Exhibit 6, 9:46-10:18). On the video, Drywater demonstrated how Defendant pinned her on the bed. (Exhibit 6, 14:31-15:05).

   2.   *Evidence of Defendant's and Drywater's Intoxication*

Officer Wardour and Lieutenant Dean testified regarding their opinions of Defendant and Drywater's intoxication. Officer Wardour testified when he entered the hotel room, it appeared to him Defendant was intoxicated. (TT 20). Lieutenant Dean testified that he did not believe Defendant was "blackout drunk" and only recalled one instance when Defendant was somewhat unsteady on his feet. (TT 75).

Lieutenant Dean said it appeared to him Drywater was intoxicated. (TT 64). However, Lieutenant Dean did not observe any signs leading him to believe Drywater was "blackout drunk." (TT 66). Lieutenant Dean testified, based on his training and experience, an individual who is "blackout drunk" could: (1) be extremely unsteady on their feet to the point of falling to the ground

---

[3] At trial, Drywater did not recall what Defendant said to her and neither party attempted to refresh her recollection with Exhibit 6. (TT 40).

6

or needing assistance standing; (2) defecate, urinate, or vomit on themselves; (3) exhibit thick and slurred speech; or (4) have trouble generating thoughts or answering questions. (TT 65, 75). While Drywater had slurred speech, Lieutenant Dean did not believe she was "blackout drunk." (TT 66, 73). Rather, Drywater struck Lieutenant Dean as "somebody that's very cognizant of what is happening and what is being said." (TT 66). Drywater was also able to complete a written statement that night. (TT 73).

The jury also had the opportunity to observe both Defendant's and Drywater's demeanor on the body camera videos. (Exhibits 1, 5-6). The body camera videos depict both Defendant and Drywater speaking, standing, and responding to questions. (Exhibits 1, 5-6).

### B. Defendant's Intoxication Expert

In his proposed jury instructions, Defendant requested an instruction addressing voluntary intoxication. (*Deft. Proposed Jury Instructions*). The district court included the proffered instruction in its final instructions to the jury. (*Jury Instructions*).

Prior to trial, Defendant also filed a notice of expert evidence. (*Defendant's Notice of Expert Evidence*). Defendant noticed his intent to call Dr. James Beaman to testify regarding "the mental, physical effects of alcohol consumption." *Id*. Dr. Beaman's testimony would "support an inference that Mr. Stewart did not have the mental capacity to form the specific intent to attempt to commit a crime" specifically, the attempted sexual abuse of Drywater. *Id*.

During trial, the government objected to the admissibility of Dr. Beaman's testimony. (TT 165). The government argued his testimony would not be helpful to the jury. (TT 165). Defendant argued some jurors may not have sufficient personal experience to know what being drunk, or blackout drunk, entails. (TT 166-67). Defendant conceded Dr. Beaman's testimony would address the issue of whether or not the victim's and Defendant's testimony and description of events was

7

believable. (TT 182). The district court excluded Dr. Beaman from testifying. (TT 182). Defendant then made an offer of proof regarding Dr. Beaman's testimony:

> Your Honor, we would make an offer of proof that if called to testify, Dr. Beaman would explain the changes that occur to a person's perception and behavior and memory as they consume alcohol. He would testify that a person who is of normal size, who is essentially continuously taking in alcohol, that the alcohol builds up in the person's body faster than the body can excrete it. That causes an increase in blood alcohol level and his report, which I would ask be made a Court exhibit, lays out the blood alcohol levels and how they relate to effects on behavior. When someone's blood alcohol reaches a level that you would expect with about eight drinks, the person is at risk of becoming blackout drunk. When a person is blackout drunk, they may appear to be functioning and moving around, but alcohol interferes with the person's brain chemistry such that their hippocampus stops communicating with the rest of their brain and interferes with the ability to form long-term memories because the hippocampus is involved in long-term memory formation. What that results in is fragmentary memories or just a complete absence of memories of events.
>
> He would also testify that as the levels of alcohol – the blood alcohol levels increase that a person's judgment and perception and ability to interact with other people is diminished.
>
> He would also testify that as people become more and more intoxicated, they may engage in riskier and reckless behaviors that would explain why people would engage in casual sex behind a bar, for example, although is consensual.
>
> He would also testify that even someone who is very drunk and blackout drunk and essentially has lost their judgment can get up and function and by all appearances, to anybody who would be having sex with them, consent to the sexual experience. They just don't remember it after the fact necessarily.
>
> He would testify that someone hypothetically who had been drinking the way James Stewart did would be impaired by the end of the – on the evening that he was with Ms. Drywater in particular, would be impaired to the point that it would interfere with his ability to perceive what a person he was with – to respond to their reactions and would be slow to respond to other people.

(TT 183-84).

## ARGUMENT & AUTHORITIES

Defendant claims the prosecutor committed misconduct by tampering with a witness and misleading the jury. He then claims his counsel filed to secured an expert of PTSD and alcohol abuse; failed to call such an expert; failed to object to a "blackout drunk theory"; failed to impeach Lieutenant Dean; failed to object to "double counting. He also asserts his appellate counsel was ineffective for failing to file a petition for certiorari with the Supreme Court. (*Motion*, Doc. #214 at 1-9). Construing Defendant's claims liberally, he has not established any entitlement to relief.

### I. DEFENDANT'S CLAIMS ARE PROCEDURALLY BARRED.

#### A. Relitigation Bar

"[A]s a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on direct appeal." *Foster v. Chatman*, 578 U.S. 48 (2016). Instead, relief under § 2255 is generally confined to situations where (a) the "convictions and sentences [were] entered by a court without jurisdiction," (b) the sentence imposed was outside of the statutory limits, (c) a constitutional error occurred, or (d) a non-constitutional error of law or an error of fact occurred that constituted a fundamental defect which inherently resulted in a complete miscarriage of justice, i.e., that rendered the entire proceeding irregular and invalid. *United States v. Addonizio*, 442 U.S. 178 (1979).

To the extent that any of Defendant's claims were already litigated or disposed of by the Tenth Circuit on direct appeal, these claims are barred. On direct appeal, the Tenth Circuit already evaluated the factual claims from Ms. Drywater in the context of a sufficiency of the evidence claim and relied upon her testimony to do so. The court did not find this testimony to be incredible or inherently unreliable. *Stewart*, 2023 WL 6629579, at *4-5. Nor did the Circuit attribute her claims to reports from Lt. Dean as suggested by Defendant's motion here. (*Motion*, Doc. #214 at

2-3). Additionally, the Tenth Circuit rejected his claim that the district court erred in excluding his expert who wanted to testify about the effects of alcohol on memory and cognitive function. *Stewart*, 2023 WL 6629579, at *5-7). The PTSD expert he now argues should have been called to testify would have offered a mere variation on the same theme and would have been barred on the same basis. Such claims are not subject to relitigation here.

### B. <u>Procedural Bar</u>

Claims not raised on direct appeal are typically barred on collateral review unless the petitioner shows cause and prejudice. *See Massaro v. United States*, 538 U.S. 500 (2003). "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Id*. The general rule is that a court cannot entertain a procedurally defaulted claim on the merits unless the defendant can excuse his default by showing either (i) cause and actual prejudice, or (ii) actual innocence. "Cause" exists when a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can establish cause by showing that defense counsel provided constitutionally ineffective assistance. *United States v. Wiseman*, 297 F.3d 975 (10th Cir. 2002). To demonstrate prejudice, a petitioner must show that the claimed error "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *United States v. Snyder*, 871 F.3d 1122, 1127-28 (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Defendant's claims masked as ineffective assistance of counsel are procedurally barred, having failed to raise them on appeal. *See United States v. Johnson*, 749 Fed. Appx. 750 (10th Cir. 2019). Instead, Defendant makes conclusory allegations that have no basis in fact, as

discussed below.  *See Rodriguez-Hernandez*, 10 Fed. Appx. at 719 (dismissing ineffective assistance claims because petitioner offered no facts to support this bare assertion and noting that while it is well settled that courts must construe pro se pleadings broadly, we will not attempt to create an argument for the [petitioner] in the absence of any discussion of the issues.)(internal citations omitted).

Because Defendant was found guilty, he cannot make any showing of actual innocence, though he attempts to do so by blaming his victim.  He further argues that factors external to his defense – the ineffectiveness of his appointed counsel – excused his default.  However, for the reasons set forth below, those arguments are without merit.  Nor has he demonstrated that a fundamental miscarriage of justice would result from the application of the procedural bar.

## II. DEFENDANT CANNOT ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL.

### A. THE *STRICKLAND* STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.

To prevail on a claim of ineffective assistance of counsel,

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or [] sentence resulted from a breakdown in the adversarial process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).

This is a conjunctive test requiring Defendant to prove both elements before he is entitled to relief.  The Court, however, is not required to address the elements in any particular order.  *Id.* at 697.  *See also Smith v. Robbins*, 528 U.S. 259, 286 n. 14 (2000) ("The performance component

need not be addressed first. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") (quoting *Strickland*); *Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This Court can affirm the denial of habeas relief on whichever Strickland prong is easier to resolve."). Further, "[t]here is a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption." *United States v. Kennedy*, 225 F.3d 1187, 1196 (10th Cir. 2000) (*quoting United States v. Williams*, 948 F.Supp. 956, 960 (D.Kan. 1996), *cert. denied*, 522 U.S. 1033, 118 S.Ct. 636, 139 L.Ed.2d 615 (1997)). *See also, Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009).

### 1. *The Deficiency Inquiry.*

Evaluation of an ineffective assistance claim is a fact intensive inquiry, requiring the court to determine "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688 (emphasis added). As the Supreme Court explained in *Strickland*, "representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 693. Further, a court must give great deference to defense counsel's reasoned choice of action.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance: that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689 (internal citations omitted). *See also Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999)

("[T]hose accused of crimes, even capital crimes, are entitled only to a reasonable and adequate defense, not the defense which, in hindsight, they believe would have been best."). In the plea context, counsel renders deficient performance if he fails to timely advise his client of a "formal plea offer," *Missouri v. Frye*, 566 U.S. 134, 144 (2012), or if he provides legally incorrect or unreasonable advice about whether to accept the plea offer, *Lafler v. Cooper*, 132 S.Ct. 1376, 1387 (2012).

### 2. *The Prejudice Inquiry.*

The party claiming ineffective assistance bears a heavy burden of proving that the claimed errors actually had an adverse effect. Defendant must show more than "that the errors had some conceivable effect on the outcome of the proceedings [as] [v]irtually every act or omission would meet that test." *Strickland*, 466 U.S. at 693. The reason for such a heightened burden of proof is that "the presumption that a criminal judgment is final is at its strongest in collateral attacks on the judgment." *Id.* at 697.

Defendant is required to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### B. THE STRICKLAND STANDARD APPLIED TO DEFENDANT'S CLAIMED ERRORS.

Defendant's Motion alleges several ungrounded instances of ineffective assistance of counsel by his court appointed attorney. However, he does not name any specific attorney throughout the entirety of the motion, merely lodging his complaints against "counsel." Regardless, the conclusory allegations, which are unsupported by either fact or legal authority, are insufficient to establish ineffective assistance. *See United States v. Rodriguez-Hernandez*, 10 Fed. Appx. 717, 719 (10th Cir. 2001)(dismissing ineffective assistance claims because petitioner

offered "no facts to support this bare assertion" and noting that "while it is well settled that courts must construe pro se pleadings broadly, we will not attempt to create an argument for the [petitioner] in the absence of any discussion of the issues.")(citing *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991)); *United States v. Scott*, 7 F.3d 1046 (10th Cir. 1993) (unpublished table opinion) ("Although we construe a pro se litigant's pleadings liberally, he is not relieved of the burden of alleging sufficient facts on which a recognized legal claim could be based. Because Defendant's . . . claims of ineffective assistance consist of merely conclusory allegations, the district court properly dismissed them.") (*citing Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). For the reasons herein, Defendant's claims against his counsel at the trial level do not amount to ineffective assistance of counsel pursuant to *Strickland*.

### 1. Alleged Failure to locate or call an expert on "PSTD combined with alcohol" or object to Dean's "black out drunk" assessment

Defendant argues his counsel should have obtained an expert on "PTSD combined with alcohol" which would impact "concentration and thought process, which was highly relevant to the mens rea requirement of 'intent.'" (Motion, Doc. #214 at 5). This is merely a re-litigation of the previously-barred expert on alcohol with PTSD thrown in as an additional ingredient. The Tenth Circuit's reasoning as to the alcohol expert applies with equal force here. See *Stewart*, 2023 WL 6629579, at *5-7. Additionally, he offers no factual support for his claim. Moreover, the Tenth Circuit has found no issue with Dean's testimony and emphasized the jurors could evaluate both Defendant and Drywater's demeanor on the officers' bodycam videos.

### 2. Alleged Failure to "effectively cross-examine the government's witnesses".

Defendant The claims are unsubstantiated and is without merit. It seems his main concern is with Lt. Dean's testimony, but he fails to demonstrate what counsel should have done differently. Generally, courts will not consider conclusory allegations not substantiated with factual and legal

support. It is Defendant's burden to "allege facts which, if prove[n], would entitle him to relief." *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir.1995), overruled in part on other grounds by *Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir.2001) (en banc). "[T]he allegations must be specific and particularized, not general or conclusory." *Id*. Courts will not "sift through the case's voluminous record to find support for the defendant's claims." *United States v. Apperson*, 441 F.3d 1162, 1204 (10th Cir. 2006) (citation omitted).

### 3. *Alleged Failure to Object to "double counting"*

Here, Defendant fails to identify any legal authority which would entitle him to relief.

### 4. *Alleged failure of appellate counsel to petition the Supreme Court*

Finally, Defendant claims his appellate counsel was ineffective for failing to petition for certiorari. (*Motion*, Doc. #372, at 8-9). He admits that such claims are not cognizable in a § 2255 motion. (*Id.*).

The record in this case establishes counsel acted in a reasonably professional manner and did not provide ineffective assistance of counsel pursuant to *Strickland*.

### III. THE COURT MAY PROPERLY OVERRULE DEFENDANT'S MOTION WITHOUT AN EVIDENTIARY HEARING.

Pursuant to 28 U.S.C. §2255(b), the Court is required to hold an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." However, in this case no additional hearing is necessary to dispose of Defendant's claims. The Court already has a well-developed record, including transcripts and a prior appeal. The files and records of the case and the authorities cited conclusively show Defendant is entitled to no relief and an evidentiary hearing would serve no purpose, nor would the denial of an evidentiary hearing be an abuse of discretion. *United States v. Barboa*, 777 F.2d 1420, 1422, n. 2 (10th Cir. 1985). The Court may properly deny Defendant's motion without holding a hearing.

15

## CONCLUSION

For the foregoing reasons, the Government respectfully requests the Court dismiss Defendant's Motion.

Respectfully submitted,


Respectfully submitted.

CHRISTOPHER J. WILSON
United States Attorney

*/s/ Linda A. Epperley*
Linda A. Epperley, OBA No. 12057
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
Telephone: (918) 684-5156
Facsimile: (918) 684-5150
linda.epperley@usdoj.gov

## CERTIFICATE OF ECF FILING & SERVICE

I hereby certify this Motion was filed via the Court's CM/ECF System on October 17, 2025. I further certify this Motion was mailed via the United States Postal Service to Defendant:

James M. Stewart, #15921-509
FCI Seagoville
P.O. Box 9000
Seagoville, TX  75140

*/s/ Linda A. Epperley*